**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| JENIYAH WARE <br> 223 Lakeside Drive, Apt. #201 <br> Greenbelt, MD 20770 <br><br> Plaintiff <br><br> v. <br><br> GOLDEN DIVERSITY, INC. <br> Patricia Brown <br> Registered Agent <br> 5625 Allentown Road <br> Suitland, MD 20746 <br><br> Patricia Brown, in her indivual capacity <br> 5625 Allentown Road <br> Suitland, MD 20746 <br><br> and <br><br> Teri Odom, Director <br> Family Court Special Services Division <br> Court Building B <br> Washington, DC 20001 <br> _____ | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

**COMPLAINT FOR DAMAGES**

1. Comes now Plaintiff, Jeniyah Ware ("Plaintiff"), by and through undersigned counsel and hereby files this Complaint for damages against Defendants Golden Diversity, Inc. ("Golden"), a District of Columbia ("D.C") corporation and DC government contracted vendor, Patricia Brown, Chief Executive Officer ("CEO"), the District of Columbia Government,

1

acting by and through its agents and employees in the Family Court Social Services Division ("CSSD"); the Department of Youth Rehabilitative Services ("DYRS"); and Defendant

Plaintiff's claims arises out of the preventable and reasonably foreseeable sexual exploitation of Plaintiff by a former adult employee of Golden Diversity, now convicted for his sexual engagements with Plaintiff. While a minor, and during pertinent times herein, Plaintiff remained under the supervision and care of the D.C. Court Social Services Division ("CSSD") and/or in the custody of its Department of Youth Rehabilitative Services (DYRS). Plaintiff asserts claims against Golden Diversity for negligence; negligent supervision, training and retention; *and* negligent infliction of emotional distress and against the District of Columbia and its managers for its deliberate indifference to Plaintiff's 5th Amendment rights via 42 U.S.C. Section 1983. As a direct and proximate result of Defendants' actions and inactions, Plaintiff suffered physical and psychological harm and injury, humiliation, anxiety, stress, mental anguish, low self-esteem and other emotional pain and suffering.

## JURISDICTION AND VENUE

2. This Court has original jurisdiction of Plaintiff's claims pursuant to 28 U.S.C. §§ 1331, and 1343; 42 U.S.C. §1983 and 42 U.S.C. §1988. Venue in this case is based upon 28 U.S.C. §1343(a)(3), as the incidents which give rise to this case occurred in the District of Columbia. Plaintiff has timely filed notice upon the District consistent with D.C. Code § 12-309.

**THE PARTIES**

3. Plaintiff, Janiyah Ware ("Ware") was born November 2, 2002. she was a 13 or 14-year-old At the time of the alleged claims, Plaintiff was a teenager, minor citizen, and DC resident. in a pre-adjudicated juvenile probation status under the management and control of Family Court Social Services Division ("CSSD"). Prior to September 2016, Ware periodically resided in court-ordered D.C. Youth Shelter Homes and/or the D.C. Youth Center. Both continuums of placement were operated and supervised by the District's Youth and Rehabilitation Services ("DYRS"). At other times pending probation, Ware resided with her father in. Washington, D.C.

4. Defendant Golden Diversity, Inc. ("Golden"), at all relevant times herein was a D.C. contractor located at 405 H St NE #B, Washington, DC 20002.

5. Defendant Patricia Brown was Golden's CEO and registered agent. On information and belief, Golden and FCSSD executed a Statement of Work ("SOW") pursuant to which Golden provided tutorial and mentorship services to adjudicated youth in and under the supervision of the District's juvenile justice system.

6. Defendant, District of Columbia government, ("District") is a municipal entity acting herein by and through the following agencies: FCSSD, DYRS. FCSSD and DYRS, which operate under the District of Columbia's judicial and executive branches, respectively. The Mayor governs the District of Columbia pursuant to D.C. Code 1-242 § 711(a). CSSD is the sole probation agency for pre-and post-adjudicated juveniles advising and serving the D.C. Family Court. At all times referenced herein, FCSSD acted by and through its then Director, Teri Odom ("Odom"), its officials, employees, and agents. Director Odom was

3

responsible for its' policies, practices, and operations. DYRS is an agency operating within the D.C. Department of Health and Human Services. It operates and manages the continuum of secure and unsecured community-based residential facilities for pre-and post-adjudicated juveniles.

7. At all times herein, DYRS acted by and through its then Director, Clinton Lacey, (hereinafter "Lacey"), its officials, employees, and agents.

8. Mr. Lacey was responsible for the Agency's policies, practices, and operation.

9. Plaintiff asserts *respondeat superior* applies where appropriate.

## FACTS COMMON TO ALL COUNTS

10. On October 27, 2016, Plaintiff, then age 13, was arrested on a misdemeanor unlawful entry charge and entered the juvenile justice system. She appeared before the DC Family Court-Juvenile and Neglect Branch.

11. During the juvenile intake process, FCSSD employees and agents interviewed Plaintiff and prepared a social and family history write-up. At the initial hearing, CSSD intake personnel represented to the Court that Plaintiff was physically and emotionally vulnerable and "perceived as a high risk for sexual exploitation and victimization."

12. On October 27, 2016, the Juvenile Court based upon CSSD's representation ordered Plaintiff detained at a DYRS-operated D.C. Youth Shelter.

13. Between October 27, 2016, and September 2017, Plaintiff was by court order detained in a continuum of custodial juvenile facilities including, but not limited to, unsecured community-based shelter homes and the District's secured YSC, which operated under the

4

District's DYRS. Upon arrest and detention, juveniles are immediately assigned to BARJ locations and programs, subject to subsequent formal court orders.

14. BARJ Centers, managed, operated, and staffed by DC government CSSD officials, agents, and employees, were created as service delivery stations for pre-and post-adjudicated juveniles and their families.

15. Upon information and belief, Plaintiff was involved in Balance and Restorative Justice ("BARJ") program beginning close to her initial October 27, 2016 detention.

16. At that time, CSSD mandated her attendance and participation in the all-female, Leadership of Today in Solidarity ("LOTS") Unit housed and connected to the Northeast BARJ satellite center.

17. At all pertinent times, through a Statement of Work ("SOW") Defendant Golden enjoyed an independent contractor service-delivery relationship with the CSSD to provide tutoring and mentoring services to juveniles at BARJ Centers.

18. As a provider of in-person tutoring services to pre-and post-adjudicated juveniles placed at the LOTS/BARJ Center, Golden shared responsibility for managing, and supervising its tutors with the District's FCSSD officials and employees. Under Defendant's Brown's management and supervision, Golden's employees interacted with DC government employees, including probation officers, relative to the implementation of Golden's contractual obligations.

19. At all material times, Anthony Brooks ("Brooks") was employed by Golden to provide tutorial services as contracted between Golden and the District of Columbia to pre-adjudicated juveniles placed at the LOTS and BARJ programs. At all material times, Anthony Brooks ("Brooks") was employed by Golden to provide tutorial services as

5

contracted between Golden and the District of Columbia to pre-adjudicated juveniles placed at the LOTS and BARJ programs.

20. Defendant Golden managed and supervised Brooks, and CSSD managers and supervisors monitored and observed Brooks in the execution of Golden's relationship with the D.C. government.

21. Brooks was monitored, supervised and evaluated by CSSD employees and agents.

22. In that capacity he visited BARJ and interacted with juvenile detainees there. His interactions were governed by protocols, procedures and policies designed to protect juvenile detainees, including female juveniles. Defendant Brown supervised Golden's tutors and mentors.

23. CSSD probation officers monitored and observed Brooks' day-to-day responsibilities and interactions with the juvenile female participants.

24. In 2016, Ms. Stephanie Lea ("Lea") observed Brooks, a mentor employed by Defendant Golden, acting inappropriately and informally in his communication with a 14 year old juvenile at the BARJ center. Pertinent to this incident, on October 25, 2016, Ms. Lea penned a Memorandum, To Whom It May Concern, articulating her concerns about Defendant Golden's employees in general, and Brooks specifically having observed him bring snacks to female juveniles and learning that he had taken a female to obtain a license

25. Ms. Lea specifically complained to Sheila Roberson Adams about her observations and memorialized "our" specific concerns regarding Golden Diversity on behalf of the Leader of Today in Solidarity Unit."

6

26. Ms. Lea added complained orally that Golden's employees were "engaged in personal conversations, playing, dancing and on their cell phones or sharing their cell phones with the youth who are not allowed access to phones while in the unit. Golden Diversity's staff appears to be too young and unfocused. They are extremely playful with the youth and do not set clear boundaries.

27. Ms. Lea also complained about Brooks verbally noting that Mr. Brooks *had one of the female juveniles to take her drivers' license exam and took her other places.* (Emphasis added) and that he was seen giving his personal cell phone number to a female juvenile in front of the court security officers ("CSOS").

28. Mr. Brooks was later seen taking pictures of the youth during a planned activity, and when directed by an appropriate officer out of concern for the youth's safety, Brooks immediately became defensive and questioned the protocol. Another infraction was observed via the camera when Brooks seemingly became frustrated with the student and displayed aggressive behavior as if he was going to hit the youth. An immediate response was requested by Lea regarding the best practice to its remedying the future safety of our youth while receiving services through this vendor. Those safety concerns included concerns about grooming and potential exploitation.

29. Ms. Lea communicated her concerns about Brooks interactions with female juveniles to Ms. Brown in subsequent communications.

30. In addition, in that same time period, to Ms. Lea, Ms. Tennant shared also reported concerns about Brooks to Ms. Robertson. Adams, Ms. Lea, and Mr. Weaver.

31. Ms. Lea and Ms. Tennant's reports included seeing Mr. Brooks give his phone number to one or more female juveniles and receiving a parental complaint about Brooks suspicious interaction with her daughter, then also a teenage participant in BARJ.

32. Despite these oral and written group concerns about Brooks' repeated interactions with more than one juvenile female, neither Defendant Brown on behalf of Golden, Mr. Odom, Ms. Roberson-Adams, nor any CSSD manager took any corrective action to protect vulnerable female juveniles.

33. Nor did Defendants take any steps, whatsoever, to alert government staff at BARJ or in the respective shelters where Plaintiff was assigned between October 26, 2016 and July, 2017 to ensure that a known vulnerable female juvenile would be protected from a potential sexual predator.

34. As a result of the District and Golden Diversity's sanctioning of Mr. Brook's clear violations of the Agency's protocols governing the manner in which these tutors were to interact with juvenile females, Brooks continued to develop an inappropriate relationship with Plaintiff despite its employees, supervisors, and managers knowing of her emotional and sexual vulnerabilities.

35. As a result, under the auspices of being Plaintiff's mentor, Brooks maintained his employment with Golden, and was able to facilitate his continued manipulative grooming of Plaintiff for sexual exploitative purposes, thereby deceptively reporting his mentorship status to various government staff in order to take Plaintiff to one or more select locations for his sexual gratification.  Upon information and belief, these communications occurred between March 2017 and July 2017.

36. On November 15, 2016 a court ordered psychoeducational evaluation was administered to Plaintiff. The assessment findings documented in the evaluation confirmed that Plaintiff suffered from emotional harm.

37. A copy of a Confidential Psycho-educational Evaluation Report (Report), dated December 2, 2016, was accessible and provided to Family Juvenile Court and all juvenile youth service providers involved in Ware's pre-adjudication case management, residential placements, and ultimate probation supervision. This included CSSD and DYRS officials, agents, and employees.

38. After documentation of her concerns about Mr. Brooks' inappropriate actions towards Plaintiff, she was demoted to a probation officer and replaced as assistant probation officer.

39. On or around March 15, 2017, Plaintiff's case was certified to the District's Juvenile Behavioral Diversion Program ("JBDP") for an eligibility determination. As a condition of her release, Plaintiff was ordered to attend a Balance and Restorative Justice ("BARJ") Drop-In Center. She was assigned to the LOTS program operated at the Northeast Satellite BARJ Office ("NESO"), located at 118 Q Street, NE, Washington, D.C.

40. On March 29, 2017, Ware signed a Juvenile Behavioral Diversion Program 'Participation Agreement."

41. Despite knowledge of Plaintiff's psychological status, sexual vulnerability, and Ms. Lea and Ms. Tennant's prior complaints about Mr. Brooks, at no time were these concerns disclosed to the court or steps taken to protect Plaintiff given her formal assignment to BARJ and continued mentorship with Brooks, now 5-6 months later.

42. Mr. Brooks by this time had effectively groomed Plaintiff and exploited her vulnerability. For the next several months, enabled by Golden and Ms. Brown, he used his tutor status to sexually exploit Plaintiff through September 2017.

43. On around September 2017, Plaintiff's father phoned Ms. Tennant and reported that there had been illicit sexual conduct between Mr. Brooks and his daughter.

44. After Mr. Brooks was charged, Mr. Odom directed Ms. Tennant and other CSSD employees not to voluntarily cooperate with the Assistant United States Attorney ("AUSA") that was prosecuting Mr. Brooks

45. In October, 2017, Ms. Tennant received a subpoena from the Office of the United States Attorney for DC concerning the Brooks criminal matter. She discussed the subpoena with her supervisor SPO Weaver who told her that she had the option of having the courts general counsel present during any meetings with an AUSA concerning the Brooks criminal case

46. Townsend told SO Weaver that she was uncomfortable meeting with the ASUA without the court's general counsel present. Shortly thereafter, Ms. Odom angrily told Townsend that she did not like how plaintiff how had handled the situation and directed her to report to the court's general counsel's office the next day to provide a full accounting of the information that she provided to the ASU a comma the FBI, and the Metropolitan Police department, which Tennant did.

47. In order to protect Ms. Tennant and other CSSD employees, in October or November 2017, Superior Court Judge Carol Dalton issued an order giving CSSD employees involved in this issue the right to have *ex parte* communications with AUSAs, and other federal and DC entities investigating the Brooks' criminal matter.

48. In May 2018, Ms. Tennant was subpoenaed to testify at the criminal trial in the brooks case, however Mr. Brooks pled guilty. Ms. Odom on several occasions expressed to Ms. Tennant her dissatisfaction with Ms. Tennant's cooperation with the AUA's in the criminal investigation and prosecution, stating that the Brooks' criminal proceedings reflected poorly on the court and the CSSD in particular.[1]

49. Defendants' officials, supervisors, and administrators, Golden Diversity and its CEO failed to fulfill mandatory reporting obligations about potential inappropriate behavior on Brooks' part as early as October 2016, through Mach 2017, through September 2017, including but not limited to investigating complaints about Brooks, taking meaningful, if any, disciplinary actions against him, including termination from his employment. Rather, Defendants ignored oral and written complaints and retained Brooks as a tutor/mentor for Plaintiff and other vulnerable female teenage girls in the juvenile justice system.

50. Despite documentation and knowledge of Brooks' inappropriate predatory behavior with juvenile girls dating back to 2016, coupled with Plaintiff's well-documented vulnerable profile, Defendants affirmatively selected and assigned Plaintiff to the LOTS/BARJ on Q Street despite having other program options to choose from.

51. Between January and September 2017, Plaintiff resided in both unsecure and secure DYRS-operated and managed custodial-facilities. At those times, Defendant, through its DYRS officials and agents, acted *in loco parentis*.

52. While detained at juvenile facilities, Plaintiff's daily routine, transportation, whereabouts, safety, and welfare were under the supervision, responsibility, and operational management of DYRS.

---

[1]/ The court should take judicial notice of Ms. Tennnant's pending claim in this same. Court, Denise Tennant v. District of Columbia, Civil Action 19-2949 (BAH).

53. At all pertinent times, Defendant agencies, its officials and juvenile justice professionals knew and/or should have known that: (a) sexual trafficking was on the rise nationwide and in the D.C; (b) pre-and post-adjudicated youth remain at greater risk of sexual victimization and trafficking than other youth populations; (c) African-American teenage girls are and have been at highest risk of sexual victimization and trafficking in D.C.; and, (d) perpetrators of sexual victimization of minors often pursue and are hired in jobs that focus on at-risk populations and provide easy access to vulnerable youths.

54. Notwithstanding the same, and knowledge of a history of DYRS creating risk of sexual vulnerability, it failed to properly protect Plaintiff. See *Doe v. District of Columbia*, 609 F. Supp. 2d 38 (D.D.C. 2009) (Describing a fifteen-year-old sexually assaulted by two older juveniles while in shelter ran by non-profit corporation contracting with DYRS).

55. At all material times, Brooks was under Defendant Golden and Brown's supervision, employment, and control.

56. Defendants and each of them granted Brooks' authority to act as their agent providing services at LOTS/BARJ.

57. Defendants held Brooks out to the community as a safe and competent employee and agent which representation amounted to approval and ratification by Defendants Golden and the District. As an employee and agent at BARJ, Brooks used his status and position to maintain, access, establish authority and gain power to develop, nurture, and manipulate a relationship with Plaintiff.

58. Brooks' agency and position facilitated his ability to set the stage and carry out the harmful, ongoing sexual acts he perpetrated on the Plaintiff.

59. Brooks was acting in part to serve the interests of Defendant employers when he relied on the status, power and authority that the position granted in order to gain and sustain the confidence and trust of the Plaintiff that enabled him to sexually groom, and abuse her.

60. The Plaintiff trusted and relied on Brooks' employment-status and apparent authority.

61. After his September 2017 arrest, on June 6, 2018 Anthony Brooks ("Brooks), Plaintiff's assigned tutor, pled guilty in the United States District Court for DC to two counts of Transportation With Intent to Engage in Criminal Sexual Activity in violation of 18 U.S.C. § 2423(a). *See*, *United States of America v. Anthony Brooks*, Crim. No. 18-29 (JEB).

## COUNT ONE
### NEGLIGENCE
(Defendants Golden and Brown)

62. Plaintiff incorporates all paragraphs 1-63 as if set forth more fully herein.

63. At all relevant times Plaintiff remained in the Behavioral Diversion program under the District's supervision, control, and jurisdiction. Additionally, at various times, Plaintiff resided in DYRS-operated and managed custodial detention facilities, including Youth Shelters and the secure detention facility.

64. At all pertinent times, as a condition of her probation and/or in compliance with the terms of her JBDP agreement, minor Plaintiff, was court-ordered and mandated to attend and receive services at the LOTS Unit, housed at the Q Street BARJ Drop-In Center.

65. At all times referenced herein, Defendants Golden and Brown owed a duty of care to Plaintiff to ensure that its employee, Brooks, would cause no harm, nevertheless, sexual harm to vulnerable juvenile girls with whom Defendants were supposedly assisting and guiding, particularly given Defendants' knowledge of Plaintiff's vulnerability to sexual exploitation.

66. As a result of Ms. Lea and Ms. Tennant's communication and complaints about Brooks, an early as July 2017, and Mr. Lea's direct communication to Ms. Brown about those concerns, Defendants' failure to investigate the concerns and/or to correct them, including disciplining, more closely monitoring and/or removing Brooks, constituted a breach of Defendants' duty of care to Plaintiff.

67. Defendant's breach of duty afforded Mr. Brooks' the ability to groom Plaintiff, to exploit her vulnerabilities, to take sexual advantage of her, and to directly and proximately cause Plaintiff emotional harm and damage.

## COUNT TWO
## NEGLIGENT SUPERVISION
(Defendants Golden and Brown)

68. Plaintiff incorporates all paragraphs 1-67 as if set forth more fully herein.

69. At all times referenced herein, based upon communication with Ms. Lea, Defendants Golden and Brown knew that Brooks' behavior and interaction with young juvenile girls was potentially unsafe or otherwise incompetent.

70. Ms. Lea discussed her concerns regarding Brooks while on duty as a mentor giving his phone number to juveniles at and taking at least one female juvenile from the facility to obtain her license, among other concerns which informed juvenile females' public safety.

71. Despite this communication, and Defendants' knowledge, Defendants failed to take any supervisorial actions to address the potential risks of harm that could occur to vulnerable young girls in the government's criminal correction environment. .

72. Further, Defendants allowed Brooks to continued mentoring and/or interacting with young female juveniles, including Plaintiff As a result of his unsupervised interaction, Plaintiff was able to groom Plaintiff, and use his influence to enjoy multiple sexual escapades with

her during her residence at government facilities and her father's home between January 2017 and September 2017.

73. Defendants' failure to investigate concerns raised with Ms. Brown about Mr. Brooks predictably created a predatory sexual relationship and scenario in which Mr. Brooks sexually exploited Plaintiff in multiple sexual engagements.

74. As a direct and proximate result of Brooks' sexual abuse and battery, Plaintiff has suffered ongoing physical and emotional including, but not limited to: chronic depression, anxiety, shame, post-traumatic stress disorder, loss of trust and lack of concentration. Plaintiff is entitled to damages as stated below.

## COUNT THREE
## CIVIL RIGHTS VIOLATION 42 U.S.C. § 1983
## FIFTH AMENDMENT DUE PROCESS VIOLATION
## (AGAINST DEFENDANT ODOM)

75. Plaintiff incorporates all paragraphs 1-74 as if set forth more fully herein.

76. Director Odom failed to put policies and procedures in play to carry out his duty to oversee that his Agency took the proper steps to protect Plaintiff, knowing by way of complaints made to her highest subordinates that her failure to do so would probably would cause a deprivation of the plaintiff's rights.

77. Defendant Odom attended hearings and closely monitored the Agency's operations and her employees' actions, and was personally involved in the Agency's decision making processes regarding Mr. Brooks, acting directly through the chain of command to whom Ms. Lea reported about Mr. Brooks.

78. Defendant Odom's knew or should have known that failure to effectuate an investigate Brooks' behaviors in July with juvenile girls could cause a potential harm by its contracted

15


service provider's employee with whom it shared supervisorial responsibility, as demonstrated by the CSSD group complaints about Mr. Brooks articulated by Ms. Lee.

79. Moreover, Defendant Odom's failed to carry other duty either implicitly or by acquiescence in her subordinate supervisors and managers' reckless disregard for potential harm to Plaintiff, particularly as here when the Agency Director grossly disregarded that duty given her knowledge of the vulnerability of the teenage juvenile girls over which she enjoyed control and responsibility.

80. To this point, there were no procedural scrutiny or practices pursuant to which Ms. Lea could have reported her complaint to the Agency Director but through her managers and supervisors. Given the significance of Ms. Lea's concerns, these managers and/or supervisors should have been required to report Global Diversity's employees' actions to her.

81. By her Agency managers and supervisors failure to take any steps to correct Mr. Brooks' actions, Defendant Odom's acted with reckless indifference to Plaintiff's rights to be free from harm, thereby violating her rights to due process.

82. Defendant Odom's actions caused Plaintiff substantial harm and damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff seeks judgment against Defendants Golden Diversity, Brown, and Defendant Odom, jointly and severally, and requests this Court to award her:

(a) Compensatory damages in an amount in excess of $2,500,000.00 for harmful injuries, including emotional pain and suffering, inconvenience, embarrassment, mental anguish, and humiliation.

(b) Attorney's fees, costs and expenses incurred pursuant to 42 U.S.C. § 1988; and,

    (c)   Such further relief as this Honorable Court deems just and fair.

## JURY TRIAL DEMAND

Plaintiff demands a trial by jury on all issues so triable.

    Respectfully submitted,

*/s/ Donald M. Temple*
Donald M. Temple, Esq.
1310 L Street, N.W., Suite 750
Washington, D.C. 20005
Tel: (202) 628-1101
Fax : (202) 628-1149
Email : dtemplelaw@gmail.com